**A.Y. STRAUSS LLC**
Eric H. Horn, Esq.
David S. Salhanick, Esq.
290 West Mount Pleasant Avenue, Suite 3260
Livingston, New Jersey 07039
Tel. (973) 287-5006
Fax (973) 533-0217

-and-

**VOGEL LAW FIRM**
Drew J. Hushka, Esq. *(pro hac vice to be submitted)*
Jack M. Buck, Esq. *(pro hac vice to be submitted)*
218 NP Avenue
PO Box 1389
Fargo, ND  58107-1389
Tel. (701) 237-6983
Fax (701) 356-6395

*Counsel to Endi Plaza LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In                                     re: | Chapter 11 |
| Endi Plaza LLC, | Case No. 25-20002-shl |
|                  Debtor. | |

## DECLARATION OF DAVID SALHANICK IN SUPPORT OF
## DEBTOR'S MOTION FOR A STAY PENDING APPEAL

I, David Salhanick, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a partner at AY Strauss LLC, the attorneys for the Debtor, Endi Plaza LLC.

I submit this declaration in support of the Debtor's motion, pursuant to Rules 8007 and 8025

of the Federal Rules of Bankruptcy Procedure, for an order staying this Court's Order, entered

on October 9, 2025 granting Fannie Mae's Motion to Dismiss Chapter 11 Case and Dismissing

Chapter 11 Case, dismissing this Chapter 11 case, and barring Debtor from filing another

bankruptcy petition for one (1) year (Dkt. 53),

2.    Annexed hereto as **<u>Exhibit 1</u>** is the transcript of the August 27, 2025 hearing on Fannie Mae's motion to dismiss.

**3.**    Annexed hereto as **<u>Exhibit 2</u>** is the transcript of the September 18, 2025 Case Management Conference.

I declarant under penalty of perjury that the forgoing is true and correct.

Dated: October 23, 2025

<u>/s/ David Salhanick</u>
David Salhanick

4930-3856-6515 v.1

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK (WHITE PLAINS)

|  |  |
|---|---|
| IN RE:<br><br>ENDI PLAZA LLC,<br><br> Debtor. <br>. . . . . . . . . . . . . . . . | .<br>. Case No. 25-20002-shl<br>. Chapter 11<br>.<br>. 300 Quarropas Street<br>. White Plains, NY 10601-4140<br>.<br>. Wednesday, August 27, 2025<br>. 10:30 a.m. |

TRANSCRIPT OF CASE MANAGEMENT STATUS CONFERENCE;
DOC. #25 MOTION TO APPROVE USE OF CASH COLLATERAL
BEFORE THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY COURT JUDGE

ZOOM APPEARANCES:

For the Debtor:          A.Y. Strauss
                         By:  ERIC H. HORN, ESQ.
                         290 West Mount Pleasant Avenue
                         Suite 3260
                         Livingston, NJ 07039
                         (973) 287-5006

For Fannie Mae:          Stinson LLP
                         By:  BENJAMIN J. COURT, ESQ.
                         50 South Sixth Street, Suite 2600
                         Minneapolis, MN 55402
                         (612) 335-1615

For the U.S. Trustee:    Office of the United States Trustee
                         By:  ANDY VELEZ-RIVERA, ESQ.
                         One Bowling Green
                         New York, NY 10004-1459
                         (212) 510-0500

Audio Operator:          Art, ECR

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
 1        (Proceedings commence at 10:30 a.m.)

 2            THE COURT:  The next case is Endi Plaza.  And so let

 3   me find out who is here on behalf of the debtor.

 4            MR. HORN:  Good morning, Your Honor.  It's Eric Horn

 5   on behalf of the debtor.  With us in court today -- or on Zoom

 6   is Mr. David Goldwasser, the proposed chief restructuring

 7   officer of the debtor.

 8            THE COURT:  All right.  Good morning.

 9            And on behalf of Fannie Mae?

10            MR. COURT:  Good morning, Your Honor.  Benjamin Court

11   of Stinson LLP on behalf of Fannie Mae.

12            THE COURT:  All right.  Good morning.

13            And in the United States Trustee's Office?

14            MR. VELEZ-RIVERA:  Good morning, Your Honor.  Andy

15   Velez-Rivera for the U.S. Trustee.

16            THE COURT:  All right.  Good morning.

17            And anyone else who might be here for this case?

18            All right.  So this is the status, as I understand

19   it, to follow up on our hearing of August 6th, at which time we

20   discussed the motion to dismiss, that was argued.  And I guess

21   I had a couple of things that I thought would be on the list.

22   One is to just get a an update on where things are.  I did see

23   there was a disclosure statement and plan filed.  I think it

24   was yesterday.  That actually contemplated a restatement of the

25   loan, which has a certain irony here, given the circumstances
```

1  in the last case.  But let me find out what other updates there

2  may be on the status of things.

3          MR. HORN:  Sure.  Thank you, Your Honor.  Again, for

4  the record, it's Eric Horn from the law firm of A.Y. Strauss,

5  appearing on behalf of the debtor.  Thank you, Your Honor, for

6  giving me the opportunity to talk about status and where this

7  case has been going.

8          Obviously, this case had a rough start.  As you may

9  recall, we took over this case.  We substituted in from

10  previous counsel, and there were some large hiccups along the

11  way to get to where we are today.  We are happy to report that

12  significant progress has been made since we stepped into the

13  case.  For instance, we've -- you know, we've -- the debtor has

14  engaged -- or has proposed engagement, Mr. Goldwasser, who was

15  -- who Your Honor has seen in various cases and in front of you

16  as well, who is going to help, you know, foster a process here

17  of getting a deal done or a plan consummated.  So that's a good

18  thing.

19          More importantly, Your Honor, is since we took over

20  this case, a DIP account has been set up, as I know that was an

21  issue early on in this case.  All rents have been transferred

22  over from the existing accounts, which was in the name of

23  the -- of Endi Apartments LLC, which was an affiliate of the

24  debtor, which is, just by way of background, always where the

25  rents were placed since the inception of the loan.  So all of

1   those rents have been placed into the DIP account.  My

2   understanding is that none of those rents have been used.  None

3   of those proceeds have been used.  We understand that Fannie

4   Mae made very clear that they're not interested in allowing the

5   debtor to use cash collateral, and that's one of the things

6   that we're here today to talk about.

7            Your Honor, we did -- this morning, we also

8   circulated to your chambers a bar date order -- a post-bar date

9   order, and a post-bar date notice.  As Your Honor referenced

10  earlier in -- a few moments ago, we did file a plan, and we did

11  file a disclosure statement.  It does rest on a reinstatement.

12  We understand that the debtor would have to reinstate about $5

13  million.  The debtor is well aware of that, and they -- you

14  know, again, that's how they are choosing to proceed.

15           Your Honor, with regard to the -- and there are also

16  issues where they -- with regard to insider payments.  And I --

17  we did file a declaration on the docket, as Docket Number 38,

18  the declaration of Lazar Ostreicher, which details -- and it

19  pretty details where those payments went, and also with the

20  understanding, as set forth in the plan, Mr. Ostreicher would

21  be the plan proponent, and he would put forth -- he would put

22  all that money back, obviously, the million plus, whatever the

23  amount is, that's set forth in the declaration.  In addition to

24  that, he would have to fund the additional monies that are

25  owing to reinstate.

```
 1              We understand -- again, Your Honor, we weren't
 2    involved in the last case.  I don't know what happened there.
 3    I hear mixed stories from both sides, but again, we're here
 4    now, new counsel, new representation, and we're eager to do
 5    something here and get a deal done.
 6              THE COURT:  Well, let me ask the question.  You said
 7    he put the money back, and he would fund it, but that all
 8    sounded in the context of a plan.  If money was taken out that
 9    shouldn't have been taken out, why should we wait till a plan
10    for the money to be put back in?
11              MR. HORN:  Your Honor, we could certainly address
12    that, but again, it was -- it's something we could certainly
13    address.  Right now, it was contemplated that it would be put
14    in.
15              THE COURT:  But this -- but it sounds like you're
16    having a negotiation about something that's non-negotiable,
17    right?  It shouldn't be the subject of, "Well, if we can make
18    everything work the way we want it to work."  I mean, remember
19    the last case, there was a promise of reinstatement.  There
20    were a lot of things said, and none of it happened.  And so
21    that's why you had so many proceedings in state court in
22    Minnesota.
23              So I'm a little -- that framing of the issue worries
24    me.  It troubles me.  So I just -- to be candid, that's not --
25    that kind of an issue, money that was taken from the debtor by
```

1  a principal and sent somewhere else, the fact that it should be

2  sent back is not -- that's just Bankruptcy 101, so.  But I

3  don't want to get bogged down on this.  Anything else you want

4  to tell me before I hear from Fannie Mae?

5          MR. HORN:  Your Honor, if may just clarify, this

6  wasn't money that was taken post-bankruptcy.  I'm -- just want

7  to put that out there.  It was monies that was taken in the

8  year prior to the bankruptcy.  So that's -- I just want to flag

9  that.  This is not --

10         THE COURT:  There was a prior bankruptcy as well.  So

11 I'm not -- again, it sounds like -- I don't want to get bogged

12 down on this today --

13         MR. HORN:  Understood.

14         THE COURT:  -- but the framing of the issue is

15 troubling to me, but we'll see if we -- how far we need to get

16 down that particular rabbit hole today, so.

17         MR. HORN:  Thank you, Your Honor.

18         THE COURT:  So with that, let me hear sort of just an

19 update on status from Fannie Mae.  I know the motion is

20 pending, so nothing about -- so getting a status change is the

21 pending motion.  And I have sort of a -- to follow up on the

22 motion in a minute that we'll get to.

23         But anything from Fannie Mae?

24         MR. COURT:  Thank you, Your Honor.  We are similarly

25 troubled by the declaration and the amount of money that was

 1 | taken from the debtor, which, as you know, our position is this

 2 | was an absolute assignment of rents.  The debtor has been in

 3 | default for more than a year.  The debtor's use of those rents

 4 | was automatically revoked.  The license that they had was

 5 | automatically revoked upon the default.  So the debtor

 6 | shouldn't have been transferring any money to anybody, much

 7 | less to insiders to use for other projects.

 8 | I noticed the list they provided identifies a number

 9 | of other projects which are similarly in trouble and are

10 | subject to other litigation that principals of the debtor are

11 | involved in.  But that money was used basically robbing Peter

12 | to pay Paul.  And that's kind of been the problem from the get-

13 | go here.  So from a status perspective, Your Honor, those are

14 | -- that's our immediate concern upon review of the declaration.

15 | Other than that, I had a very brief chance to look at

16 | the plan.  I don't think it's really much of a plan.  And other

17 | than that, there really is no status.  We haven't been paid any

18 | money in more than a year.  We've, you know, tried to do

19 | everything we can to get this back on the track.  The debtor

20 | hasn't been able to do it.  They haven't been able to make the

21 | payments.

22 | THE COURT:  All right.  And on status, anything from

23 | the United States Trustee's Office?

24 | MR. VELEZ-RIVERA:  Your Honor, this is Andy Velez-

25 | Rivera.  The only comment I have on status is that we did take

1  a look at the plan.  On its face, it does look illusory and

2  infeasible.  It tells you that -- it tells one -- anybody

3  reading it that it -- that the debtor's principals are going to

4  come up with $5 million.  But in the same vein of robbing Peter

5  to pay Paul, it doesn't tell us where the 5 million are going

6  to come from or what collateral is going to be put up for that

7  money.  It -- the plan itself invites a whole host of

8  litigation.  That's all I have to say.

9           THE COURT:  All right.  So to loop back for a second

10 to the motion to dismiss -- and I wanted to give you all an

11 update on something that I came across, as well as what my

12 current thinking is.  So I had understood, from our

13 conversation, there was a recitation of docket entries on the

14 state court in connection with the receiver proceedings.  And I

15 understood Docket -- they were all -- all these were filed on

16 the 6th of June.  Docket 52 was the notice of bankruptcy

17 filing, Docket 53, an order for judgment, and Docket 54, a

18 notice of filing of an order and entry of judgment.

19           And I -- the explanation in the pleading by the

20 debtor, at ECF 27, I think on Page 3, understandably, said,

21 "Well, 52, 53, 54, they're sequential."  That makes perfect

22 sense, the way I understand dockets work.  And so that would

23 mean, with Docket 53 and 54 filed at 1:26, which I would

24 represent in the pleas to be Eastern Time, that 52 would be

25 before that.  And so 52 says notice of bankruptcy filing.

1       But when I went back to look at our own records, the
2  -- that didn't really square.  What I have seen, in asking our
3  clerk's office to look at things, that our records indicate
4  petition was filed at 1:52 of Eastern Standard Time.  And since
5  received/filed isn't necessarily entered, right -- so we get
6  things here in the Court that aren't necessarily
7  instantaneously filed.  If it's electronically filed, it's done
8  instantaneously.

9       But so, for example, somebody drops something off, we
10  may receive it at a certain time, and it may get docketed
11  later.  But the receipt of it, for purposes of when it becomes
12  effective, is the important time.  But what I have, as the
13  clerk's office provided me with it, a time of 1:52.  And so
14  that would seem to me a couple of different things.  It would
15  seem to me then if that's right -- and I can sort of take
16  judicial notice of what the clerk's office is telling me, but
17  I'm happy to provide sort of the actual documentation -- that
18  the bankruptcy appears to have been filed after the receiver
19  order was entered, and that the notice of bankruptcy filing
20  appears to have been filed before the bankruptcy case was
21  filed.

22       So that seems to be relevant for a couple of reasons.
23  It does mean that there's a question of what the order says or
24  doesn't say might still be a live issue.  I understand that
25  that issue was one of sort of several that were argued by

1  Fannie Mae.  One was that the -- there was a bar in that order,

2  and obviously if that order -- receipt of order wasn't entered

3  before the bankruptcy, it wasn't effective.  Although I know

4  that Fannie Mae also made the argument about a bad faith

5  filing, which is not dependent on the receiver order.

6          And so I wanted to alert folks as to that bit of

7  information that we sussed out here in court, because it seems

8  to be important to understand what the facts actually are.  So

9  I was hoping to confirm, and I would think that anybody who's

10  filing a bankruptcy would actually get some -- a file stamp of

11  when they made the filing, so I can figure out what actually is

12  the time.  So I need that confirmed.

13          MR. HORN:  Right.

14          THE COURT:  And then it sounds like there's no issue

15  about adequate protection.  There's been no payment, so that

16  issue is not -- that seems pretty clear factually where we are

17  for purposes of the record.  And I guess the last thing I would

18  say is it's important for me to know what actually happened

19  here.  The suggestion a bankruptcy was filed before the

20  bankruptcy was filed, that's a problem.

21          And I don't know what the local rules are in state

22  court as to what it says, but if it says the notice of

23  bankruptcy filing means what it says, then it means it was

24  filed before the bankruptcy was filed, which seems to be a

25  concern.  So that's what I'm trying to suss out and nail down,

```
 1  because I think those things are important for me to have a

 2  sense of.

 3          But again, I think for adequate protection, whether

 4  any payments to Fannie Mae, I wanted to know that, because

 5  there is sort of an informal legal doctrine here in the

 6  bankruptcy court that you put your money where your mouth is,

 7  but it sounds like no money has been paid to Fannie Mae, so

 8  that's not in dispute, so I know that.

 9          But let me ask debtor's counsel if you can illuminate

10  anything as to the actual time for the filing, which again, I

11  have is 1:52 p.m. Eastern Standard Time.

12          MR. HORN:  Your Honor, thank you.  If I may just

13  address that briefly.  It does on the petition -- again, we

14  didn't file the petition, but on the petition stamp, it says --

15  where'd it go?  It says, "Entered 6/6, 13:52 and 44 seconds."

16  So that's 1:52 and 44 seconds.

17          Your Honor, with regard to the other things, I just

18  want to -- I mean, we do mention in the papers that the

19  petition was filed at 1:52.  We say that in Paragraph 1,

20  "relevant facts and backgrounds."  When we go -- if you go to

21  Paragraph 4 of the opposition that we filed -- and the

22  opposition's at Docket Number 27 -- we say, "On June 6th, 2025,

23  at approximately 4:51 p.m. Eastern Time, a judgment was

24  uploaded to the receivership action as Docket Number 56."  That

25  docket entry was the one that actually appointed the receiver.
```

1   And that --

2           THE COURT:  I understand that, but how was it that

3   there was a notice of bankruptcy filing filed before the

4   bankruptcy was filed?

5           MR. HORN:  Your Honor, I have no idea.  I wasn't

6   involved in filing that.  I have no clue.

7           THE COURT:  Isn't that another relevant fact for

8   purposes of bad faith here?  I mean, it certainly strikes it.

9   Now, again, I haven't decided the issue of bad faith, but it

10  certainly was in the chronology of things sort of glossed over.

11  And that troubles me, right?  It's telling a state court and

12  telling the world that a bankruptcy has been filed when it

13  hasn't.

14          Now, I understand there's always a mad scramble in --

15  well, there's often a mad scramble when filing, and I get it.

16  And so if we're talking about a minute or two or somebody's run

17  off to do one thing, somebody else has run off to do something

18  else, that's one thing, but this is a little bit more than

19  that.  So I -- am I missing something about being troubled by

20  that?

21          MR. HORN:  Your Honor, I certainly understand why you

22  would be troubled.  Unfortunately, I don't have access to the

23  Minnesota docket.  I would like to have the opportunity, if

24  Your Honor allows us, to, you know, put in --

25          THE COURT:  I have your recitation of the Minnesota

```
 1   docket in your papers at Sentence 8 (phonetic), ECF 27.  Page 3

 2   lays it all out, and has the 1:26 as the -- we don't have a

 3   time for Docket 52, but we have a time for Docket 53 and 54,

 4   which is 1:26.  So by virtue of the way time works, Docket 52

 5   has to be earlier than that.  So I'm going to make sure I

 6   wasn't --

 7               I see Mr. Goldwasser's hand up.  I'm not here to talk

 8   to witnesses.  I'm here to talk to counsel right now.

 9               MR. GOLDWASSER:  Okay.  Just the time in Minnesota is

10   when I --

11               THE COURT:  No, no, no.

12               MR. GOLDWASSER:  Okay.

13               THE COURT:  Mr. Goldwasser.

14               MR. GOLDWASSER:  Sorry.  I'm sorry.

15               THE COURT:  Now's not the time.  Now's not the time.

16               So, Mr. Horn, again, I'd appreciate some illumination

17   on that fact.  If you want to take a chance to figure something

18   out, talk to Mr. Goldwasser, but I --

19               MR. HORN:  Your Honor, just a letter explaining it.

20   Again, I don't have access to the Minnesota court docket.  I

21   have to call Minnesota counsel, who would be able to opine on

22   this.  I just have no way to look at a Minnesota docket.

23               THE COURT:  Yeah, I know.  But the thing is I do have

24   your representation in the opposition about what it says and

25   the time.  So, I mean, I'm not asking you to opine on something
```

1    new.  I'm, essentially, sort of challenging a bit of the

2    narrative.  Again, I understand your point that a judgment at

3    Docket 56, entered at 4:51, that's the receiver order.  I got

4    it, but I'm a little troubled by the other aspect of it.

5              So I understand, from your point, the operative thing

6    is the judgment at Docket 56, and that's clearly after the

7    bankruptcy filing.  So I get it.  All right.  So --

8              MR. HORN:  Your Honor, could I -- no, I think it's --

9    I think we have -- we have to (indiscernible) for the hour

10   difference.  So I think it would be 2:36.

11             THE COURT:  That's not what your paper's saying.

12   Look at your paper.  ECF 27, Page 3, you say --

13             MR. HORN:  Your Honor, I could fix that, if it's a

14   problem.  That's what I'm saying.  If it's a problem, we

15   could --

16             THE COURT:  No.  You don't fix what you already told

17   me.  What you told me, in a footnote that says, "We have made

18   sure all times are Eastern Standard Times" -- that's what your

19   footnote says.

20             MR. HORN:  Okay, Your Honor.  I understand that, but

21   again, I would like to get verification to you, if possible.

22             THE COURT:  I know.  That's what I said.  You should

23   do that.  Yes.

24             MR. HORN:  Okay.  I will certainly do that, and I

25   will certainly put a letter on the docket explaining it, if

1   there is something wrong with regard to that, Your Honor.

2           THE COURT:  All right.

3           MR. COURT:  Your Honor, I think I can clear this up,

4   if you'd permit me a moment, because I was there.

5           THE COURT:  Okay.

6           MR. COURT:  I was counsel of record in the Minnesota

7   action, and here's what I can tell you.  I'm staring at a

8   service email from the Minnesota District Court.  I'm looking

9   at it on my screen right now, dated 6/6/2025 at 12:26 p.m. CST.

10  That would be 1:26 Eastern Time.  That is service of the order

11  appointing receiver.  And, in fact, the filing description

12  says, "Order appointing a receiver.  E-served attorneys.

13  Mailed to other defendants."  That is, again, dated 1:26 p.m.

14  Eastern Time.  The bankruptcy was filed at 1:52.  That is --

15  you know, that is after, a half an hour later.  It's that

16  simple.  The docket entry is irrelevant.  The order was served

17  at 12:26 Central Time.

18          THE COURT:  Well, the order -- we've already had an

19  oral argument about service of the order versus entry of the

20  order, and so I understand your reliance on service and the

21  judge signing it, but it wasn't docketed, so I think

22  everybody --

23          MR. COURT:  Sure.

24          THE COURT:  -- understands what the facts are.  The

25  only new fact that I was troubled by -- because as a bankruptcy

 1   judge this caught my attention -- is that the notice of

 2   bankruptcy filing appears to be before the bankruptcy was filed

 3   by about a half an hour, so that's fine.

 4          So let me give the parties an update on where I am,

 5   because I realize that there's a lot of other things going on,

 6   and I owe you an answer, but I want to make sure I have my

 7   facts -- my ducks in a row before I make a more formal ruling.

 8   Is on the one hand, I am -- I don't think I'm convinced that it

 9   is appropriate, as a matter of law, to have a bar that's

10   entered like this, that have that be effective to bar a debtor

11   from filing bankruptcy.

12          I -- my inclination is that the cases that are cited

13   are distinguishable in a whole host of different ways.  And

14   while I understand that corporate authority is governed by

15   state law, this isn't corporate authority.  This is a receiver,

16   and this is a model that, frankly, could be followed throughout

17   the country to say, "Well, just get the receiver order and get

18   that extra line in there that says only the receiver can file

19   bankruptcy," and it robs the debtor of an ability to file

20   bankruptcy, which seems to trod upon well-established law.

21          On the other hand, as you can probably tell from my

22   questioning when we got together for the argument earlier this

23   month, I remain concerned that this is a bad faith filing, and

24   I don't need the receiver order to get there.  And that's one

25   of the reasons why I did talk about this notice of bankruptcy

1    filing, because it seems to be more of the same, and the fact

2    that there's been no payments made to Fannie Mae, despite the

3    prior history and circumstances here.  So I just want to let

4    you know where I am.  I need more time to put things together,

5    but I also need to make sure that I have the facts correct.

6          So what I would say is, Mr. Horn, by the end of the

7    week, if there's anything different about this timing for

8    Docket 52 -- which, according to everything that's been

9    submitted to me and argued to me, had to be entered on the

10    docket before 1:26 Eastern Standard Time, compared to the

11    actual bankruptcy filing, which occurred at 1:52 p.m. -- then

12    you can let me know.

13          MR. HORN:  Right.

14          THE COURT:  If there's nothing to say, then there's

15    nothing to say.

16          MR. HORN:  Your Honor, may I just make one note,

17    though?  Because, again, we're talking about -- I heard you

18    mention that no other payments are made to Fannie Mae.  Again,

19    there's over $300,000 sitting in the DIP account.  Under the

20    cash collateral budget that's being proposed, we're paying them

21    $127,000 a month for adequate protection.  Despite what they

22    say in their papers that it doesn't contain adequate

23    protection, the budget clearly says that it contains adequate

24    protection.  So again, we're ready, willing, and able to make

25    those payments.  It's -- again, the money is there.

```
 1              THE COURT:  All right.  I get it.  So -- but what I'd
 2   ask is if you'd submit something by no later than Friday at
 3   noon, and if there's something to say -- if there's nothing
 4   filed, then I assume there's nothing additional to say about
 5   the timing of various pleadings.  And then my thought would be
 6   to get you a ruling sometime in the early part of September, so
 7   that we can figure out where we are.

 8              And so that's sort of my update.  And again, I
 9   wouldn't say -- to quote the legal wisdom of My Cousin Vinny --
10   that this thing about the timing of the notice of bankruptcy
11   filing is the case-cracker.  It is, however, a relevant fact,
12   and I want to make sure I have my facts straight.

13              So with that, I think the thought would be, once I
14   get closer, to schedule something in the first half of
15   September, to get -- and then have chambers get in contact with
16   you about dates to confirm that those are good, so I can make a
17   ruling on the pending motion filed by Fannie Mae, and then we
18   can see where we are.  But I understand that ruling sort of is
19   holding everything up.

20              So that's my update.  I got your update, so I wanted
21   to give you my update.  And with that, let me ask if there's
22   anything else that can reasonably be accomplished here today.

23              MR. HORN:  Your Honor, I just want to -- there
24   currently is a hearing scheduled for September 18th, and we did
25   propose -- not to get into settlement discussions, but we did
```

```
1   propose to adjourn the hearing today on cash collateral to the
2   18th, so we could try to work towards a resolution here.  That
3   was denied by Fannie Mae, so here we are today doing cash
4   collateral, in addition to that.
5           So what I would say, Your Honor, if your -- if the
6   ruling is basically the linchpin here, it might make sense just
7   to kick cash collateral out, even though it's -- we're only
8   seeking on an interim basis, to September 18th.
9           THE COURT:  Well, again, then you're not seeking
10  authority to use it before September 18th.  Am I understanding
11  that correctly?
12          MR. HORN:  No, no, we were seeking to use it on an
13  interim basis, you know, pursuant to an interim order that was
14  hopefully going to be entered.  But again, I --
15          THE COURT:  Well, then, you're not -- but then you're
16  not kicking it.  You're -- you want it granted on an interim
17  basis until September 18th.
18          MR. HORN:  That was the original inclination, but
19  again, we'd have to get through some of the issues raised in
20  the cash collateral, you know, the opposition to it.  I'm happy
21  to go through that opposition with Your Honor.
22          THE COURT:  All right.  Well, let me ask Fannie Mae
23  what its views are about sort of the efficient way to handle
24  this.  Again, we're dealing with requests for dismissal where
25  there are certain issues -- kinds of issues raised.  I want to
```

 1  make sure to have my ducks in a row, and I need a little bit

 2  more time to do that.  And again, one of those facts I need to

 3  have nailed down.

 4        So I can do this -- I hope to be able to do this for

 5  the 18th.  And if I can, I'll -- we'll let you know in

 6  chambers, and we'll schedule it before then.  But I'm trying to

 7  figure out what's an efficient use of people's time today.  I

 8  don't know exactly what -- there's obviously a desire to

 9  maintain the collateral, but I also understand that there's

10  money -- concern about money going out the door.

11        So does Fannie Mae have any suggestions about how to

12  thread that particular needle for purposes of today?

13        MR. COURT:  Well, Your Honor, it's obviously the

14  debtor's motion.  We're not going to consent to the use of cash

15  collateral under the circumstances.  And let me just raise two

16  quick issues for a thought.

17        Mr. Horn, who I recognize is new, indicated there's

18  about $300,000 in an account right now that is being held.  But

19  what is troubling to me is this case was filed on June 9th.  It

20  is now almost September.  There have been at least two rent

21  cycles that have occurred from the time of the filing till we

22  sit here today.  My understanding is the rental income is over

23  $370,000 each month.  So where's the rest of the money?  If no

24  money has been used, where's the rest of the money that would

25  have been, you know, obtained through those couple of rent

1 | cycles?

2 | And number two, you know, one concern we have is if

3 | nobody's getting paid, no vendors are getting paid, the debtor,

4 | by trying to just kick the can down the road -- which has been

5 | their modus operandi for a long time here -- administrative

6 | expenses are accumulating here, which is further making, you

7 | know, our client's collateral and our position in this case

8 | troubled.

9 | So, I mean, we're prepared to go forward today. We

10 | don't think there's any basis for the debtor to use cash

11 | collateral here. And I'm not going to get into my argument,

12 | but you've seen what it is, Your Honor. You know, the

13 | principal issue is these rents are not property of the estate.

14 | The debtor shouldn't have them, period.

15 | So, I mean, you know, putting that aside for a

16 | moment, where's the rest of the money? And what -- do -- can

17 | we get some understanding of what expenses are accumulating

18 | here, which could be construed as administrative expenses to

19 | the estate?

20 | MR. HORN: Your Honor, if I could respond just

21 | briefly. Your Honor, with respect to the rent cycle, all the

22 | money is -- again, the DIP account was set up in early August,

23 | following -- remember, we had that -- Your Honor, we had that

24 | discussion earlier on in the case. And that was what we --

25 | that was what was discussed, and it was a reaction to what was

```
 1   in that discussion.  Your Honor, we -- per your mandate and per

 2   your direction, Your Honor -- and this is -- I think you --

 3           THE COURT:  Well, you don't -- you --

 4           MR. HORN:  Your Honor, I have -- but can I please

 5   finish?  And then you can yell at me.  It's fine.  But I'd like

 6   to at least have the opportunity to finish, to explain, and

 7   I'll -- you can yell at me all you'd like, and that's fine.

 8           THE COURT:  But before I do that, I know you're new

 9   to the case, but I'm not, and neither is your client.

10           MR. HORN:  Understood.

11           THE COURT:  So just so you understand why you have a

12   very active bench here and an active situation, it's because

13   your client has really --

14           MR. HORN:  Understood, Your Honor.  Again, none of my

15   clients are perfect.  Let's put it that way.  Okay?  That's the

16   understatement of the year.

17           THE COURT:  Well, you know, so if you want to call me

18   out on not letting you finish, I'll call you out on being glib.

19   That's --

20           MR. HORN:  That's understood, Your Honor.

21           THE COURT:  -- really --

22           MR. HORN:  I apologize for being glib.  That's not my

23   intention, Your Honor.  I show no disrespect to the Court.  I

24   have the utmost respect for Your Honor and this courtroom.

25           THE COURT:  But it's disrespectful to the case.  I
```

 1   mean, I've got a pretty thick hide.  I'm not worried about

 2   myself.  But it just sort of sits, like, "Oh, it's not a big

 3   deal."  It is a big deal.  I'll let you finish.  Please, go

 4   ahead.

 5          MR. HORN:  Your Honor, it is a big deal.  What I was

 6   saying, Your Honor -- again, I do apologize.  What I was

 7   saying, Your Honor, is that as soon as everything was set up

 8   and we indicated to the Court what we were going to do, we took

 9   immediate action to do it.  We immediately moved all the monies

10   from the Endi Apartments LLC account, which was always the case

11   -- again, from -- since the inception of the loan, all rents

12   were paid into that account -- and moved those into the debtor-

13   in-possession financing account.  There have been no -- debtor-

14   in-possession account, excuse me.

15          There have been no monies taken -- at least it's my

16   understanding there have been no monies taken.  I confirmed

17   this this morning with Mr. Goldwasser's officer.  There have

18   been no monies taken with regard to payment of any expenses

19   from a DIP account.  It remains -- the monies remain as they

20   were.  Again, Mr. Luzi Ostreicher -- Mr. -- excuse me -- Lazar

21   Ostreicher -- and this was one of the conditions.  We explained

22   to him very clearly, we said, "You have two options.  You

23   either get kicked out of this case, or you agree to fund this

24   case on your own for the time being, until we get use of cash

25   collateral."

1          And he understood that, and he agreed.  He made the

2     agreement that he was going to fund this case, not as a DIP

3     loan, but as more of a capital contribution, that he was going

4     to fund this case until the cash collateral order was decided

5     upon.  So during that period, since the monies were put into

6     the DIP account and no monies had been spent, Mr. Ostreicher

7     has been funding this himself.  So it's important that -- Your

8     Honor, that I point that out.  Because Mr. Court gets --

9          THE COURT:  Well, that sort of turns things on its

10    head.  And the usual way that things happen is if there's a

11    shortfall.  And I didn't hear anything disputing the 375 figure

12    for rents per month.  Then people say, "Well, we recognize

13    there's a shortfall.  Here's where it went.  Here's -- it was

14    either used appropriately, and it won't be returned, or it

15    wasn't used appropriately.  Will be returned."  But I don't

16    hear anything engaging on that now.

17         So you're saying he's funding the case, but, in fact,

18    there's money missing.  So he may be funding the case from the

19    monies that were received, if it's 375 a month.

20         MR. HORN:  Your Honor.

21         THE COURT:  And you can enlighten me on that.

22         MR. HORN:  Your Honor, I do not have the facts on

23    that.  But what I could tell Your Honor, we have communicated

24    very clearly to Mr. Ostreicher, is that -- and to the extent

25    that any monies were taken out post-petition, okay, they have

1  to be immediately returned into the DIP account.

2              THE COURT:  No, I appreciate what you may have said

3  to your client, but it doesn't change the facts.  It doesn't

4  change the numbers.

5              MR. HORN:  I understand, Your Honor.  I'm saying that

6  what I will tell him after the hearing is what I'm saying, Your

7  Honor.  Again, we -- Your Honor --

8              THE COURT:  If your client's here and listening at

9  the hearing, then he's heard it, so.  But -- and it was

10  discussed at the last hearing, so.  But that's fine.  Anything

11  else you want to tell me before we figure out where to go from

12  here?

13              MR. HORN:  No, Your Honor, I don't.

14              THE COURT:  All right.  So let me ask if the U.S.

15  Trustee's Office has anything they want to add to the mix.

16              MR. VELEZ-RIVERA:  This is Andy Velez-Rivera.  Not at

17  this time, Your Honor.  Thank you.

18              THE COURT:  All right.  So I think I'm going to do

19  the following, because I think I'm not making things any more

20  helpful.  I'm going to grant the motion to dismiss, and I --

21  with opinion to follow, because I think this is a bad faith

22  filing.  And I -- in that -- in my decision, I am not going to

23  rely on the bar in the state court order, because I think

24  that's problematic as a matter of law.

25              But I do think that there is a very troubling history

```
 1  here -- I -- in terms of -- I mean, it's somewhat eye-opening

 2  that there's a sort of a placeholder plan that says the money

 3  -- that things are going to be reinstated.  And that's what's

 4  was said -- has been said repeatedly over time.  And there's

 5  really -- there's been no -- nothing provided that says that

 6  that's actually a legitimate option here.  And what's that old

 7  expression?  Fool me once, shame on you.  Fool me twice, shame

 8  on me.  And so it seems to fall into that category.

 9          I also think there's a lot of -- you know, there are

10  times when there's a -- bad faith, as we know, is a facts-and-

11  circumstances concept.  And there's discussion in the case law

12  about, too, look at what's going on in the case.  You're

13  looking at what's going on before the case.  You look at what

14  went on in the prior case.  And I think it's a flexible test,

15  because you sort of need to be able to look at things and

16  decide what the narrative is and how it all fits together.

17          But it fits together in this case not in a good way.

18  And so between what happened in the prior case, what happened

19  in the state court, something as minor as the notice of

20  bankruptcy filing, which appears to have been filed prematurely

21  in a way to fend off something in state court, and then how

22  this case landed, I appreciate counsel's efforts to try to turn

23  the aircraft carrier.  And I have no doubt that you've told

24  your clients the right things to do.  But there seems to be no

25  dispute as to what the rent number is.  And that means this is
```

 1   an enormous shortfall here.  And there's really no explanation

 2   about that.

 3           And the idea that once admonished that's when the

 4   obligation kicks in is not the way the system works,

 5   particularly where there's a prior case where these issues have

 6   been flagged over and over and over again.  And again, this

 7   case has been around for a while.  And the normal sort of way

 8   that things are approached is, "Hey, if we -- we're going to do

 9   something like get an investor, and here are the ideas to fund

10   this reinstatement," people then, at this point, have come

11   forward with something that gets the attention of the creditors

12   saying, "No, we actually are going to make this work."  And

13   then people are always, I've found, willing to listen when

14   there's actually a prospect of getting paid.  That's -- people

15   welcome that.

16           But there is nothing here on that front.  And what

17   there is instead is a very troubling history in this case that

18   dovetails with the past history.  So I mention this now.  In a

19   perfect world, I'd be in a position to get a decision out

20   before, you know, sharing these comments.  But I realize that

21   we're at the point where we're teeing up issues that I don't

22   think are productive to tee up, such as exactly what's going on

23   with the assignment of rents.  That said, the issue of courts

24   going different ways depending on the state law and depending

25   on the terms in the agreement, the facts and circumstances,

 1  it's an interesting issue.  But I'm spending all of your money

 2  on that issue when I think that's really not going to be

 3  appropriate.

 4        So I will just tell you, in general terms, where I'm

 5  going.  I'm going to grant the motion.  And I will pick a day

 6  to give you a more fulsome decision with all the necessary

 7  bells and whistles, unless I issue something of a written

 8  nature.  So I just think that that's the appropriate and just

 9  way to proceed here, given all the facts and circumstances,

10  rather than waste your time trying to deal with a bunch of

11  other issues that, frankly, given where we are on the motion to

12  dismiss and the question of bad faith, it's just not an

13  appropriate and productive use of your time.  And I don't want

14  to waste your time.  It's just not -- that's just not an

15  appropriate way to go.

16        So that's where I am.  I will endeavor to get this

17  done.  I'll use the 18th as the outside date.  But my intent is

18  to get it done sooner than that.  But again, whether it's in a

19  bench ruling, or I call you all up and bring it into the

20  record, or whether it's a written ruling, I'm not quite sure

21  yet.  But I'll endeavor to get that done quickly.

22        So with that, Mr. Horn, I don't know if you have any

23  comments, questions.  You're certainly free to do that.  But

24  again, I'm trying not to waste anybody's time in a way where I

25  think I can see -- they say in pool, I think I see the shot.

 1 | And so I don't want to waste your time on scrambling to do

 2 | other things that really, in order of priority and the decision

 3 | tree, the motion to dismiss is sort of first up, so.

 4 |        MR. HORN:  Your Honor, listen, I appreciate you

 5 | making the decision before everyone had to do the additional

 6 | work.  It is helpful.  You know, what I was going to ask -- and

 7 | it sounds like it would be, you know, not welcome -- I was

 8 | going to ask if we could have the opportunity to write a letter

 9 | to the Court explaining the rent situation, you know, the

10 | monies that -- you know, the rent amount, and where those

11 | monies went, because there may not even be a discrepancy.  And

12 | I just don't want that to influence Your Honor's decision.

13 |        THE COURT:  Well, I have the record I have in front

14 | of me.  We already argued the motion to dismiss.  And we have

15 | had sort of these issues about the budget come up.  I don't --

16 | I mean, it's a relevant fact, and I didn't hear anything today

17 | that anybody told me that there's something different about the

18 | money that's gone, and so that there is not -- there's money --

19 | I guess what I would say, for purposes of my decision, I would

20 | rely on the following facts.

21 |        That there's a figure of some 375 cited as rents per

22 | month.  The amount of money that's being held is X.  That is

23 | not consistent with the amount of money that should be held if

24 | all the money set aside would be -- would have been put away,

25 | and that that other money is unaccounted for.  And so that's

```
 1  what I would say.  Again, I think people have had notice of

 2  these issues.  We had our original hearing on the motion on

 3  August 6th.  But today, I made sure to check the docket last

 4  night for any developments, and there really weren't any of

 5  note on this.  There was just the plan and the disclosure

 6  statement that was filed.  I guess those were, I guess, filed

 7  yesterday.

 8          So I have to rely on it, but I'm not making any

 9  conclusions that they were taken by the principal.  I'm just

10  making conclusions they're unaccounted for.  And so that's sort

11  of where I am.  And that seems to be a fair thing to do, given

12  that this is the second hearing on these issues.  And so the

13  matters were already sub judice.

14          Like -- but, Mr. Horn, that's -- so that's where I

15  am, for what it's worth.  I don't know if you have any other

16  questions or (indiscernible).

17          MR. HORN:  Yeah, I did, Your Honor, but don't yell at

18  me.  What I was going to ask, Your Honor, if we could have an

19  evidentiary hearing on this, and, you know, take -- call

20  witnesses and, you know, have parties cross-examined as to

21  where -- you know, these issues should be able to be fleshed

22  out in court.

23          THE COURT:  Right.  So what -- so on what motion are

24  we having an evidentiary hearing?  Because we've already fully

25  argued and had submitted the motion to dismiss, right?  I --
```

 1  it's what I thought the status was.  I understand we didn't

 2  have argument on this particular point, but it does seem a day

 3  late and a dollar short when folks sort of had notice that they

 4  hadn't provided -- again, this sort of gets into the reporting

 5  obligations of a debtor, and the fact that you didn't have a

 6  debtor-in-possession account until somebody screamed about it.

 7          And so it -- again, the obligation to have a debtor-

 8  in-possession account, keep track of these things in monthly

 9  operating reports is an obligation that exists in the

10  Bankruptcy Code.  Nobody has to chase you down and give you

11  notice of that, because it's in the Code.

12          So with that, let me, let me ask for any comments

13  from Fannie Mae on this.

14          MR. COURT:  Your Honor, I think you -- thank you.

15  And again, I appreciate that Mr. Horn is new to this case, but

16  none of the rest of us are.  I think your decision is a good

17  one.  Our biggest concern, right now, is what happens between

18  today and the time that your order is issued, because we've got

19  this receiver order out there.  The -- our concern is based on

20  past conduct.  We're very concerned about what's going to

21  happen to the money and where the rest of it went.

22          And I know that's water under the bridge, in terms of

23  where the rest of it went.  But with the money that's being

24  held, I'm not asking Your Honor for a ruling on that, but I'd

25  like to get an understanding from Mr. Horn that we're --

1  nothing is going to be removed from that account unless or

2  until an order comes out.  And my position would be the moment

3  that the dismissal order is issued, the receiver order,

4  notwithstanding any of the other issues, that's immediately in

5  effect.

6          And so the only thing I would be concerned about is

7  just timing, so that we can get everything in place with the

8  receiver.  And I'll certainly give everyone a heads-up about

9  this.  And I'm not asking for you to telegraph anything, but

10  I'm just raising couple concerns that we've got, based on the

11  situation.

12          THE COURT:  All right.  And let me hear from the U.S.

13  Trustee's Office.

14          MR. VELEZ-RIVERA:  Andy Velez-Rivera.  I'm sorry,

15  Your Honor.

16          THE COURT:  It's all right.

17          MR. VELEZ-RIVERA:  Just getting online.  That's fine.

18  And we would echo that actually.

19          THE COURT:  All right.  So let me ask the very

20  practical question for any responses to Mr. Horn's request for

21  an evidentiary hearing on the status of the monies, just so I

22  can be very clear about this.  The -- that really goes to the

23  question of the record before me.  And so I'm not sure if

24  Fannie Mae's notion is that, "Judge, that's an additional fact.

25  It doesn't -- at the end of the day, you don't need to rely on

1  it."  Or, "Yeah, you very much need to rely on it, and it's

2  very fair to rely on it at this point."  Or, "Let them submit

3  what they want, and we'll respond."

4         So with that, let me hear from Fannie Mae as to your

5  thinking.

6         MR. COURT:  Your Honor, I don't think an evidentiary

7  hearing is needed.  This is yet another attempt by the debtor

8  to just delay what I think is the inevitable here.  And I think

9  this is a bad faith filing.  And we agree with you.  We've

10  raised that issue before the Court.  I think an evidentiary

11  hearing on this issue is a waste of time.  The facts are what

12  they are.  The rents are what they are.  The money that's

13  available is what it is.

14         There are -- there's no factual disputes about any of

15  that.  How the money was used, frankly, is irrelevant.  It's

16  not there.  These are -- you know, this is Fannie Mae's

17  collateral.  This is -- you know, if the debtor's -- we don't

18  believe it's true, but if, you know, these are funds of the

19  estate and not Fannie Mae's, the debtor just can't -- I mean,

20  regardless of when the DIP account was opened, what was

21  available before that?

22         I mean, there's just so many more issues that the

23  more you peel this onion, the uglier it gets.  I just don't see

24  what the point of an evidentiary hearing is going to get to,

25  Your Honor.  We -- I think we know what the answer is.

```
 1            THE COURT:  All right.  From the U.S. Trustee, any
 2  last thoughts?
 3            MR. VELEZ-RIVERA:  This is Andy Velez-Rivera.  We
 4  have to defer to Mr. Court on that one, Your Honor.  It's his
 5  client's collateral, and we happen to agree with everything he
 6  said.
 7            THE COURT:  All right.  So what I'm going to do is
 8  ponder this for another day or so.  If I believe an evidentiary
 9  hearing is appropriate, I will enter an order that schedules
10  one and sets forth what is required.  If I don't do that before
11  the week is out, what that means is that I am staying with my
12  initial impression that an evidentiary hearing is not
13  appropriate and not necessary on this factual record, and that
14  dismissal as a bad faith filing is appropriate, and an
15  appropriate result regardless of the request.  So with that,
16  that's where I am.
17            And let me ask if there's anything else from any
18  other party.  My thought is we already have a date of the 18th,
19  and I told you what my intentions are.  So the 18th is really a
20  control date.
21            And with that, Mr. Horn, anything else from you?
22            MR. HORN:  No, Your Honor, but thank you for hearing
23  this today.
24            THE COURT:  All right.  Thank you.  Anything else
25  from Fannie Mae?
```

```
 1              MR. COURT:  No, Your Honor.  Just so I'm clear,

 2    you're not ruling on cash collateral at this point.

 3              THE COURT:  No.  I think at this point, again, you

 4    filed your motion to dismiss because you thought that is the

 5    place where we should start, and that in light of my decision

 6    on the dismissal motion, we don't need to reach anything else.

 7              MR. COURT:  Okay.  Just wanted to make sure I

 8    understood.

 9              THE COURT:  No, no, that's a good clarification, and

10    I think that's a helpful thing to put on the record.

11              And last but not least, anything from the United

12    States Trustee's Office?

13              MR. VELEZ-RIVERA:  We're good today, Your Honor.

14    Thank you so much.

15              THE COURT:  All right.  Thank you very much.

16              And, again, I appreciate everybody's willingness to

17    have a discussion about these things.  Sometimes I end up where

18    -- in places that people don't want me to be, but again, I try

19    to be as transparent as I can about what I'm thinking so that

20    you all can respond.

21              And, Mr. Horn, I do appreciate your responses, and I

22    understand some of this is a record that you don't have a whole

23    lot of control or knowledge of, but I do appreciate you very

24    gamely engaging on the questions that have come up today, and I

25    appreciate that.
```

1        And thanks to everybody else for their thoughts as we

2  try to figure things out in real time.  So thank you very much.

3  Have a good rest of your day.  Be well.

4        UNIDENTIFIED:  Thank you, Judge.

5        UNIDENTIFIED:  Thank you, Your Honor.

6     (Proceedings concluded at 11:19 a.m.)

7                        *  *  *  *  *

8

9

10

11

12

13

14                **C E R T I F I C A T I O N**

15

16        I, Alicia Jarrett, court-approved transcriber, hereby

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21

22

23  _____

24  ALICIA JARRETT, AAERT NO. 428     DATE: September 8, 2025

25  ACCESS TRANSCRIPTS, LLC

# EXHIBIT 2

```
                    UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF NEW YORK (WHITE PLAINS)

                                      .
IN RE:                                .  Case No. 25-20002-shl
                                      .  Chapter 11
ENDI PLAZA LLC,                       .
                                      .  300 Quarropas Street
                                      .  White Plains, NY 10601-4140
                  Debtor.             .
                                      .  Thurs., September 18, 2025
. . . . . . . . . . . . . . . . .  .  10:52 a.m.



        TRANSCRIPT OF CASE MANAGEMENT STATUS CONFERENCE;
        DOC. #25 MOTION TO APPROVE USE OF CASH COLLATERAL;
  DOC. #29 APPLICATION TO EMPLOY FIA CAPITAL PARTNERS LLC AND
            DESIGNATION OF DAVID GOLDWASER OF FIA AS CRO;
  DOC. #31 APPLICATION TO EMPLOY A.Y. STRAUSS LLC AS COUNSEL TO
               THE DEBTOR AND DEBTOR IN POSSESSION
               BEFORE THE HONORABLE SEAN H. LANE
               UNITED STATES BANKRUPTCY COURT JUDGE


TELEPHONIC APPEARANCES:


 For the Debtor:            A.Y. Strauss
                            By:  ERIC H. HORN, ESQ.
                            535 Fifth Avenue
                            New York, NY 10017
                            (646) 374-0255

 For the Creditor:          Stinson LLP
                            By:  ZACHARY H. HEMENWAY, ESQ.
                            1201 Walnut Street
                            Kansas City, MO
                            (816) 842-8600

APPEARANCES CONTINUED.

Audio Operator:             Art, ECR

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46048
                            (855) 873-2223
                            www.accesstranscripts.com

      Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

1

TELEPHONIC APPEARANCES (Continued):

```
For the United States    United States Trustee's Office
Trustee:                 By:  ANDY VELEZ-RIVERA, ESQ.
                         1 Bowling Green
                         Suite 534
                         New York, NY 10004
                         (212) 510-0500
```

1          (Proceedings commence at 10:52 a.m.)

2          THE COURT:  All right.  Next up is Endi Plaza LLC, a

3  Chapter 11 case.  So let me find out who's here on behalf of

4  the debtor.

5          MR. HORN:  Good morning, Your Honor.  Eric Horn for

6  the debtor.

7          THE COURT:  All right.  And on behalf of Fannie Mae?

8          MR. HEMENWAY:  Good morning, Your Honor.  Zach

9  Hemenway of Stinson LLP on behalf of Fannie Mae.

10          THE COURT:  All right.  On behalf of the United

11  States Trustee's office?

12          MR. VELEZ-RIVERA:  Good morning, Your Honor.  Andy

13  Velez-Rivera for the U.S. Trustee.

14          THE COURT:  All right.  Good morning.  And anyone

15  else who's here for this case?

16          All right.  So we have some things on the calendar,

17  but consistent with our last get-together, I owe you all a

18  decision, and so my intent is to give you a bench ruling today.

19  And I'm not sure whether I'll commit this to writing and put it

20  on the docket, but there's no reason to wait.  So the

21  transcript will serve as a -- as the ruling.

22          So before the Court is the motion to dismiss the

23  Chapter 11 case and a request for judicial notice.  That can be

24  found at ECF Number 19, and it was filed by Fannie Mae, a

25  creditor of Debtor Endi Plaza LLC.  The motion requests the

1  Court take judicial notice of an order for judgment and notice

2  of filing of judgment, which I'll refer to as the state court

3  order as it was made by a state court in Minnesota.  And Fannie

4  Mae has requested that the Court consider this order -- the

5  state court order in requesting dismissal of this bankruptcy

6  case as a case filed in violation of that state court order and

7  also in bad faith under the Bankruptcy Code.

8          The debtor filed an objection to the motion and all

9  of the requests of Fannie Mae.  See debtor's objection to

10 Fannie Mae's motion, and -- hold on a minute here.  I have a

11 page that's reversed.  Give me one second.  There we go.  So

12 that is debtor's objection to Fannie Mae's motion and request

13 for judicial notice.  The objection is at ECF Number 27.  So

14 for the reasons that I will explain, the motion is granted.

15          So first, I'll set out the background.  The debtor

16 owns and operates real property known as the ENDI Apartments

17 located in 2120 London Road, Duluth, Minnesota.  See motion in

18 Paragraph 1.  Debtor entered a series of loan agreements with

19 Greystone Servicing Company LLC on the property for

20 $51,800,000, and that loan agreement was later assigned to

21 Fannie Mae at the end of March 2023.  See motion, Paragraph 25.

22          As part of the loan agreement, the debtor assigned

23 all leases, rents, revenues, and income from the property.  And

24 that's explained in the motion, Paragraph 8.  The agreement

25 includes personal liability for outstanding amounts in the

1   event of a default.  See motion, Paragraph 16.

2          Fannie Mae alleges multiple forms of default by the

3   debtor, including providing false and inaccurate financial

4   documents, taking rents -- siphoning rents for the benefit of

5   other parties, and willful misconduct.  That's set forth in the

6   motion, among other places, Paragraphs 11 through 14.

7          In fact, the debtor did default on the agreement by

8   failing to remit payments to Fannie Mae from June 1st, 2024,

9   and thereafter.  On September 2024, Fannie Mae sent three

10  default notices to the debtor, and on November of 2024, Fannie

11  Mae brought an action against the debtor in the District Court

12  of St. Louis County in Minnesota there in state court.  And

13  that action sought foreclosure and the appointment of a

14  receiver.

15         So on December 9th, 2024, the debtor filed a -- for

16  the first time a Chapter 11 petition in this court, and that of

17  course stayed that receivership action in state court.  See In

18  re Endi Plaza LLC, Case Number 24-23068, a bankruptcy case in

19  the Southern District of New York in 2024.

20         At the outset of the first bankruptcy, Fannie Mae

21  moved to limit debtor's use of cash collateral as Fannie Mae

22  alleged misuse of the funds by debtor given a provision

23  agreement that the rents had actually been assigned to Fannie

24  Mae.  See that first case bankruptcy docket at ECF Number 14.

25         The debtor did not oppose Fannie Mae's motion, and

6

1  debtor and Fannie Mae ultimately negotiated a resolution to

2  reinstate the agreement between the parties.  This proposed

3  resolution required use of certain funds of debtor's bankruptcy

4  estate, and that resulted in the debtor requesting a voluntary

5  dismissal of this first bankruptcy case although Fannie Mae had

6  stated on the record that it did not necessarily require

7  dismissal for reinstatement.  But in any event, the case --

8  that first bankruptcy case was dismissed March 10th of 2025.

9         So despite the renewed actions to funds provided by

10  the dismissal of the first bankruptcy, the debtor ultimately

11  failed to reinstate the loan or remit any payments to Fannie

12  Mae.  Meanwhile, between June 2024 and June 6th, 2025, which

13  includes the period while the first bankruptcy was ongoing, a

14  total of some $3,287,000 -- 278 -- sorry -- $3,287,030.73 of

15  rents were collected and maintained by non-debtor, ENDI

16  Apartments LLC.  Approximately $1,118,853.64 of this amount

17  were transferred to insiders.  See declaration of Lazar

18  Ostreicher regarding disbursements and allocation of proceeds,

19  Paragraph 11, ECF Number 38, and that's for this bankruptcy

20  case.

21         Due to debtor's continued default, Fannie Mae resumed

22  the state court receivership action, and on June 5th, 2025, the

23  state court heard oral argument regarding the receivership

24  request and request for foreclosure.  On June 6th, 2025, the

25  state court issued an order and judgment and appointed a

1  receiver.  That same state court order barred the debtor from

2  filing for bankruptcy protection without the receiver's

3  approval.  See state court order, Paragraph 12.

4         That paragraph provided in relevant part, quote,

5  "borrower and its officers, directors, members, managers,

6  managing members, owners, agents, representatives, employees,

7  successors, and assigned are further enjoined from exercising

8  any and all powers of" the -- "of borrower and its officers,

9  directors, members, managers, managing agents, owners, agents,

10 representatives, employees, successors, and assigned,

11 including, without limitation, the authority and power to file

12 a voluntary petition under Title 11 of the United States Code.

13 For avoidance of doubt, no person or any other than the

14 receiver shall have the authority or power to file a voluntary

15 petition for the borrower under Title 11 of the United States

16 Code."  And again, that's at the order -- state court order

17 that was entered, Paragraph 12.

18        It's noteworthy for our purposes that the state court

19 did not so order the record as the appointment of a receiver or

20 the bankruptcy court -- or on the actual day of the hearing on

21 June 5th.  Rather, that was all contained in the state court

22 order.

23        So on June 6th, 2025, at 1:26 p.m., the state court

24 uploaded the order, and for the purposes here, we're

25 recognizing that the state court here is in the Central Time

1   Zone.  I'm going to nonetheless follow the parties' lead in

2   making all references to time to be in Eastern Standard Time.

3   So if you look at -- you can see this time on the receivership

4   action docket at Number 53.

5           So prior to the docketing of the state court order,

6   however, the debtor had filed on the state court docket a

7   notice of bankruptcy filing, and that was at Docket 52.  And

8   obviously, the Court can take judicial notice that 52 comes

9   before 53.  So therefore, it had to be done before the 1:26

10  time.  And so this notice was filed prior to the entry of the

11  state court order that appointed a receiver and included the

12  purported bankruptcy bar.  So you can compare the receivership

13  action Docket 52 with the Docket 53.

14          So the actual Chapter 11 voluntary petition in this

15  case -- and this case being 25-20002 -- was not filed with the

16  bankruptcy court until 1:52 p.m., which you can see by the

17  petition, ECF Number 1.  At the August 27, 2025, hearing in

18  this case, the Court raised concerns as to whether the notice

19  of bankruptcy filing was actually filed with the state court

20  prior to the filing of the actual bankruptcy petition.  See the

21  hearing transcript from the August 27th hearing at Page 11,

22  Lines 9 through 11.

23          Debtor's counsel subsequently gave an explanation

24  that this wasn't the case, with any timing issues reflecting

25  the mechanics of docketing.  See a letter to the Honorable Sean

1  H. Lane regarding the timing of the filing of the notice of

2  bankruptcy with the Minnesota State Court, Exhibit A.  That's

3  all set forth at ECF Number 45 in this case.  But a review of

4  the receipt automatically created by the court's case

5  management and electronic case filing system confirms that the

6  bankruptcy petition was filed electronically by Joshua

7  Bronstein at 1:52 p.m. on June 6th, 2025, and that the notice

8  was filed -- that the notice filed in the state court was filed

9  before the bankruptcy petition was actually filed.

10       So some days -- some ten days or so after the

11  bankruptcy filing, the debtor retained new counsel.  See

12  substitution of counsel, ECF Number 9.  At the debtor's initial

13  Section 341 meeting held on July 17th, 2025, it was revealed

14  that the debtor had not established a debtor-in-possession bank

15  account but rather was maintaining all funds in the ENDI

16  account that is by a non-debtor third party.  See declaration

17  of David Goldwasser in the -- at ECF 46, Paragraphs 3 through

18  5.  So at the 341 meeting, the debtor was reminded by the U.S.

19  Trustee's Office of the need for the debtor to have a

20  debtor-in-possession account, and that was finally established

21  on July 18th, 2025.  See the Goldwasser declaration, Paragraph

22  6.

23       At the same 341 meeting, the parties agreed that all

24  funds were considered property of the bankruptcy estate and

25  should be transferred to the DIP account.  Of the $385,953.63

1   held in the ENDI account on the month of July, however, only

2   between $37,830.10 and $50,230.10 were ultimately transferred

3   to the DIP account.  So there's some variation in the numbers

4   there, but the whole point is to compare that number.  Whatever

5   number it is -- take the highest version of it is

6   fifty-thousand-some-odd dollars -- is considerably less than

7   the $385,000 held in the ENDI account for the month of July.

8   And this doesn't take into account there's some $26,000

9   discrepancy to what the Court calculates as the June ending

10  balance and the July beginning balance and which can be found

11  at the Goldwasser declaration, Paragraph 8.

12          So on June 27th, Fannie Mae filed this motion seeking

13  dismissal of this bankruptcy case, alleging that it's a

14  violation of the state court order that barred the filing of a

15  bankruptcy by anyone other than the receiver and also alleging

16  that the bankruptcy case was filed in bad faith given all the

17  facts and circumstances.  The debtor filed an objection to that

18  motion on July 30th, and the Court held oral argument on

19  August 6th.  At the August 6th hearing, the Court took judicial

20  notice of the order -- state court order in the receivership

21  action and took the matter under advisement.  There was a

22  subsequent hearing on August 26th, and we had a discussion --

23  I'm sorry.  Let me back up.

24          On August 26th, the debtor filed its Chapter 11 plan

25  of reorganization for the debtor at ECF 42 and a belated

1   disclosure statement at ECF 43.  The hearing actually took

2   place the next day, August 27th, 2025, which was the status

3   conference.  And at that time, the parties and the Court were

4   together to seek clarification on certain factual issues and to

5   also assess the overall status of the bankruptcy case.  See

6   hearing transcript of August 27th, Page 2, Line 18 through 25

7   at ECF 48.

8           During that conference, the Court was informed that

9   Mr. Ostreicher remained in possession of certain insider

10  transfers made to himself.  It was explained that he intended

11  to return those funds as part of a plan of reorganization --

12  that is, the plan that was filed at Docket Number 42 -- and

13  then to fund additional amounts required to reinstate.  See

14  hearing transcript at Page 4, Lines 15 through 25.

15  Additionally, it was brought to the Court's attention that the

16  debtor's monthly rent roll was approximately $370,000, and yet

17  the debtor-in-possession account only had approximately

18  $300,000 despite debtor collecting at least three months' rent.

19  See hearing transcript at Page 20, Lines 18 through 23.

20          So at the conclusion of that hearing and in order to

21  provide some clarity to the parties moving forward, the Court

22  granted the motion and explained that it would subsequently

23  provide a ruling to explain its decision.  See hearing

24  transcript Page 25, Lines 20 through Page 25, Line 15.  And

25  today's decision is that decision.

1        So turning to an analysis of the motion, Fannie Mae

2   presents two main arguments.  First, it argues that the debtor

3   was barred from filing this case by virtue of the state court

4   order and the bar on the filing of bankruptcy that reserved

5   that power only for the receiver.  Second, Fannie Mae argues

6   that this case should be dismissed as a bad-faith filing.  The

7   Court rejects Fannie Mae's first argument but agrees with the

8   second.

9        So turning to the first issue, the enforceability of

10  the filing restriction in the state court order:  when a party

11  in interest moves for a dismissal on the grounds that a debtor

12  lacked authority to file, the burden of proof is on the moving.

13  See In re Quad-C Funding LLC, 496 B.R. 135, 142 (Bankr.

14  S.D.N.Y. 2013).  Accordingly, Fannie Mae here carries the

15  burden of proving that the state court order was entered prior

16  to the filing of the petition and the order's prohibition on

17  filing was enforceable.  State law governs who may initiate

18  bankruptcy proceedings.  See In re Source Entertainment [sic]

19  Inc., 392 B.R. 541, 554 (Bankr. S.D.N.Y. 2008).

20       It is well-established that, quote, "no state

21  enactment may limit the jurisdiction of the Bankruptcy Court,"

22  end quote.  In re Bankshare's Corporation of U.S. 20 F.2d 94,

23  95 (2d. Cir. 1931).  More specifically, a state court cannot

24  deny an entity the ability to file for bankruptcy protection.

25  See International Shoe v. Pinkus, 278 U.S. 261, also 49 S.Ct.

```
1   108 (1929), where the relevant quote is:  "A state is without

2   power to make or enforce any law governing bankruptcies that

3   impairs the obligation of contracts or conflicts with the

4   national bankruptcy laws."  Moreover, the appointment of a

5   receiver for a corporation does not deprive its directors of

6   the power to file a petition in bankruptcy.  See In re Prudence

7   Company, 79 F.2d 77, 80 (2d. Cir. 1935), citing Struthers

8   Furnace Corporation v. Grant, 30 F.2d 576 (6th Cir. 1929).

9           So as against this general proposition, Fannie Mae

10  relies on various decisions from some courts for the

11  proposition that the state court order here appropriately

12  limits the debtor's ability to file for protection by placing

13  that authority solely with the receiver.  And I -- and see

14  motion at Paragraph -- I'm sorry -- Page 13, which cites a

15  number of cases, including In re Apex Brittany MO, LP, Case

16  Number 23-11463-ctg, a bankruptcy case from Delaware in 2023.

17  And I think the notion is that the Court should construe this

18  state court order as simply commenting on who has authority to

19  file as a matter of state law rather than infringing upon the

20  bankruptcy court's jurisdiction, but the Court disagrees.

21          It is true that on the one hand, the entities who may

22  be debtors under the Bankruptcy Code Sections 101,

23  Subparagraph 15 and 101, Subparagraph 41 and 109, which

24  includes corporations, limited companies, partnership trusts.

25  These are, quote, "creatures of state rather than federal law,
```

1  and their governance structures are determined under state

2  law," end quote.  See In re Orchards Village Investments LLC,

3  405 B.R. 341, 346 (Bankr. D. Or. 2009).  But their purported

4  bar here does not reflect the corporate structure of the debtor

5  in the ordinary course.  Rather, it is a bar borne out of the

6  efforts of a creditor seeking to protect and advance its rights

7  as a creditor.  Thus, the purported bar here is akin to cases

8  where a creditor has sought a bankruptcy bar to protect the

9  creditor's rights and by exercising a blackball -- that is,

10 some sort of bankruptcy block that is essentially a veto over a

11 debtor's ability to file.

12      See e.g. Bank of China v. Huang (In re Huang),

13 275 F.3d 1173 (9th Cir. 2002), a case that holds it's against

14 public policy for a debtor to agree with a creditor not to file

15 bankruptcy.  See In re Intervention Energy Holdings, LLC,

16 553 B.R. 258 at 265, -66 (Bankr. D. Del. 2016), holding it's

17 unenforceable as a matter of federal public policy to provision

18 an amended operating agreement granting a creditor veto power

19 over the debtor's ability to file for bankruptcy.  See also In

20 re Peli, P-E-L-I, 31 B.R. 952, 956 (Bankr. E.D.N.Y. 1983), a

21 case finding that written terms of the settlement agreement

22 that purport to waive the right to file a bankruptcy petition

23 violate public policy and are unenforceable.  See also In re

24 Bay Clubs Partners-472, LLC, 2014 WL 1796688 (Bankr. D. Or.

25 2014), a case holding prepetition waivers of bankruptcy

1  protection are contrary to public policy.  And to continue one

2  more time, Continental Insurance Company v. Thorpe Insulation

3  Corporation (In re Thorpe Insulation Corporation), 471 F.3d

4  1011, 1026 (9th Cir. 2012), which states, quote, "This

5  prohibition of prepetition waiver has to be the law.

6  Otherwise, astute creditors would routinely require their

7  debtors to waive," end quote.

8       The cases cited by Fannie Mae are distinguishable

9  from the cases that bar and the cases that bar this kind of

10  maneuver.  So to go through them, first, In re Apex Brittany is

11  an unpublished decision where the court refused to entertain

12  the very argument advanced here but instead dismissed on other

13  grounds.  A second case, In re El Torero Licores, involved a

14  contentious relationship among brothers who were business

15  partners, and that resulted in the state court appointing a

16  receiver because there was litigation over an alleged breach of

17  a partnership agreement.  And that case can be found 2013 WL

18  6834609, Central District of California, December 20th, 2013.

19  In that case, the receiver's barred powers were the result of

20  internal issues that left the partnership unable to manage

21  itself and make decisions.

22       Similarly, a third case, In re Sino Clean Energy Inc.

23  involved a bankruptcy filing by former members of the board of

24  directors who were moved prior to the filing of bankruptcy,

25  leaving them without authority to file for bankruptcy.  See In

1   re Sino Clean Energy, 901 F.3d 1139, 1140-41 (9th Cir. 2018).

2   And indeed, the Sino Clean Energy court distinguished the

3   Second Circuit's decision in the Prudence Company case, which

4   I've already referred to as one of the cases that talk about

5   the general -- a bar on this sort of thing.  And in Sino Clean

6   Energy, it noted that it was distinguishable from Prudence

7   because a new board had been installed.  And so that's at the

8   In re Sino Clean Energy case, 901 F.3d at Footnote 33.

9           So while the Court certainly understands the

10  frustration of Fannie Mae with the debtor here given the

11  history and the facts of this case, the appropriateness of this

12  bankruptcy filing is a matter for this Court, this bankruptcy

13  court to decide as a matter of federal bankruptcy law.  And

14  federal bankruptcy law in fact is very well-equipped to handle

15  exactly these kinds of circumstances, which leads us to the

16  second argument.  So Fannie Mae's second argument is an

17  argument that this is a bad-faith filing.  This second argument

18  for dismissal fares far better than the first.

19          Section 1112(b) of the Code states that after notice

20  in hearing, a court shall dismiss a case under this chapter for

21  cause.  Cause is not defined in the Code, as is often noted,

22  but among examples of cause provided in the Code are

23  substantial and continuing loss or diminution of the estate and

24  absence of reasonable likelihood of rehabilitation, quote,

25  "mismanagement of the estate, authorized use of cash

```
 1  collateral, subsequently harmful to one or more creditors,

 2  failure to comply with an order of the court, unaccused failure

 3  to satisfy timely any reporting or filing requirements

 4  established by the Bankruptcy Code or any rule applicable to

 5  the case."  So the list provided by the Code is meant to be

 6  informative but not exhaustive.  It's meant to be a guide, but

 7  courts may find cause for dismissal where there is a lack of

 8  good faith.  See the often-cited In re C-TC 9th Avenue

 9  Partnership case, 1113 F.3d 1304, 1311 (2d. Cir. 1997).

10          So the filing of -- I'm sorry -- the finding of cause

11  for bad faith is a two-part test requiring both subjective

12  proof of bad faith and objective futility.  See In re General

13  Growth Properties, 409 B.R. 43, 65 (Bankr. S.D.N.Y. 2009),

14  citing the much-cited In re C-TC 9th Avenue Partnership case.

15  A determination of bad faith requires a full examination of all

16  the circumstances of the case.  It is a highly factual

17  determination but also one that may sweep broadly.  See In re

18  General Growth Properties Inc., 409 B.R. 65, and that's citing

19  Baker v. Latham Sparrowbush Associates from the In re Cohoes

20  Industrial Terminal Inc. case, 931 F.2d 222, 227 (2d. Cir.

21  1991).  Given the scope of the examination required, a court

22  may rely on both prepetition and post-petition conduct of the

23  debtor.  See In re -- I'm sorry.  See Marrama v. Citizens Bank

24  of Massachusetts, 549 U.S. 365, a 2007 case in the Supreme

25  Court upholding a bad-faith finding was primarily on
```

1    prepetition conduct.  See also other cases, In re Lin, 499 B.R.

2    430, 436 (Bankr. S.D.N.Y. 2013), finding ample basis for

3    dismissal based on debtor's prepetition conduct and emphasizing

4    her lack of financial transparency.

5         So in addition to bad faith, the Court may consider

6    are a debtor having only one asset, the debtor having few

7    secured creditors with claims that are small in relation to the

8    secured creditors' claims, a debtor's lone asset is the subject

9    of a foreclosure action resulting from arrearages who defaults

10   on the debt, the debtor's financial condition being more or

11   less a two-party dispute between the debtor and the secured

12   creditor can be resolved in a pending state court action, the

13   timing of the debtor's filing suggesting an intention to delay

14   or hinder legitimate efforts to enforce the debtor's secured

15   rights, the debtor having little or no cash flow, the debtor

16   being unable to meet current expenses including the payment of

17   real estate taxes, and the debtor having no employees.

18        So see Pleasant Pointe Apartments, Limited v.

19   Kentucky Housing Corporation, 139 B.R. 828, 832 (W.D. Ky.

20   1992).  No one factor is determinative of good faith or bad

21   faith, and a court must examine the facts and circumstances of

22   each case in light of several established guidelines or

23   indicia, including conducting an on-the-spot evaluation of the

24   debtor's financial conditions and motives.  Again, see In re

25   General Growth Properties, 409 B.R. 56.  That determination,

1  again, is heavily fact-based and does not requires -- but still

2  does not require a court to hold a formal evidentiary hearing

3  so long as the record is sufficiently developed to draw the

4  necessary inferences.  Once again, In re General Growth

5  Properties, a 409 B.R. 56, in this case citing Oneida Motor

6  Freight, Inc. vs. United Jersey Bank, 848 F.2d 414, 416 n.3

7  (3d. Cir. 1988).

8         Once the movant has established the existence of both

9  subjective bad faith and objective futility, a rebuttable

10 presumption of bad faith arises, and the burden shifts to the

11 debtor to establish good and sufficient reasons why the relief

12 should not be granted.  See In re Valid Value Properties, LLC,

13 2017 WL 123751 at Page *6 (Bankr. S.D.N.Y. January 5th, 2017).

14 See also -- and that's citing Squires Motel, LLC v. Gance and

15 the In re Squires Motel, LLC bankruptcy, 417 B.R. 29 at Page 34

16 (N.D.N.Y. 2010), which is itself citing a In re Yukon

17 Enterprises, Inc., a case from the Bankruptcy Court in the

18 Central District of California, 39 B.R. 919, 921.  As -- so a

19 debtor must demonstrate the existence of unusual circumstances

20 that establish the dismissal is in fact not in the best

21 interests of creditors in the estate.  Again, see Value --

22 Valid Value Properties, LLC at *6.

23        So the record here establishes bad faith.  The

24 relevant facts are well-established based on the events of the

25 first bankruptcy case, the receivership action, and the case in

1    bar.  And other than the dispute about the timing of the actual

2    notice filed in the state court, the notice of bankruptcy,

3    there's really no just -- versus the actual timing of the

4    filing here, there's no factual dispute at all.  And frankly,

5    while that is from the debtor's point of view a bad fact, it's

6    not at all one that's dispositive of what the Court has going

7    on here, and putting -- even putting that to the side, there's

8    more than sufficient evidence of bad faith.

9          So let's -- based on the extensive record, several

10   indicia of bad faith indeed are present.  First, the debtor's

11   lone asset is the property, and the debtor lists relatively few

12   secured creditors, none of whom have appeared in this case.  So

13   see official form 2004 at ECF Number 13.  See also In re AMC

14   Realty Corporation, 270 B.R. 132, 142, Bankruptcy Southern

15   District of New York.  Furthermore, as noted above, the

16   catalyst for the first bankruptcy case in this case was Fannie

17   Mae's pursuit of its right as a creditor, which included its

18   pursuit of foreclosure in the receivership on the property.

19   Indeed, the debtor has explained this filing as intended to

20   resolve that dispute between Fannie Mae and the debtor.  See In

21   re Syndicom Corporation, 268 B.R. 26, 51 (Bankr. S.D.N.Y.

22   2001), finding bad faith where debtor's bankruptcy petition was

23   intended to frustrate a two-party dispute that was capable of

24   resolution in state court.

25          Of course, the mere fact that there's a proceeding in

1   state court between a secured creditor and a debtor is not

2   sufficient evidence of bad faith, but the timing of the filing

3   here given the totality of the circumstances does evidence an

4   intent to delay and to frustrate Fannie Mae's legitimate

5   efforts to enforce its rights, particularly given the filing of

6   the second case so soon after the dismissal of the first and

7   given the broken promises as to reinstatement.  See In re 652

8   West 160th LLC, 330 B.R. 455 (Bankr. S.D.N.Y. 2005), and see

9   also In re Kaplan Breslaw LLC, 264 B.R. 309 (Bankr. S.D.N.Y.

10  2001).  That was a filing on the eve of foreclosure.  And also

11  again, In re Valid Value Properties, 217 WL 123751 at *6, and

12  he had a filing on the eve of foreclosure, which was found to

13  indicate bad faith given the totality of the circumstances.

14          So Counsel had argued that the debtor is now acting

15  in good faith and that the case is back on track with debtor

16  meeting its obligations under the Code.  See objection at

17  Page 8, and see hearing transcript from August 27th at Page 3,

18  Line 8 through Page 4, Line 6 and Page 23, Line 7 through 25.

19  But the record shows otherwise.  The debtor's counsel stated

20  all rent proceeds were transferred to the DIP account, but a

21  review of the bank account statements provided by the debtor

22  demonstrates that this couldn't possibly be the case.

23          So at the time the motion was first argued,

24  Mr. Goldwasser's declaration shows that despite $385,000 of

25  rent receipts into the ENDI account, the July month end DIP

1  account balance was a mere $55,000.  See Goldwasser declaration

2  Paragraph 8, Exhibit B.  So a further cursory review of

3  Mr. Ostreicher's declaration shows the debtor's rent roll was

4  and likely still is being used to fund other projects that were

5  not and likely even more underwater than the debtor's.  See the

6  Ostreicher declaration, Paragraph 11.

7        So using a different timeframe, a month later, the

8  situation has not demonstrated appropriate action by the

9  debtor.  So at that time, in August 27th, Fannie Mae noted and

10 the debtor did not dispute that the debtor's monthly rent role

11 was approximately $370,000, and yet the debtor's DIP account

12 only had approximately $300,000 despite the debtor having

13 collected at least three months of rent while in bankruptcy.

14 See hearing transcript for August 27th, Page 20, Line 18

15 through Line 23.

16        And it's also crucial that the debtor's never

17 returned the money to the estate from the rents, again,

18 assigned to Fannie Mae, and that fact is undisputed, where

19 those rents were transferred to insiders.  See Ostreicher

20 declaration, Paragraphs 9 and 11, Goldwasser declaration,

21 Paragraph 8.  When read together, these indicate at least $1.2

22 million of insider transfers took place since June 6th, 2024.

23 And despite these transfers being identified in the first case

24 many months ago, only a small portion of that money was

25 returned to the estate.  See Goldwasser declaration, Paragraph

1   10, Exhibit C, showing a return of some $218,000 as compared

2   with the some $1.2 million of insider transfers.

3           Debtor seeks to Band-Aid this problem a bit by

4   offering to return the money as part of a confirmed plan down

5   the road.  That's contained in the plan -- the proposed plan of

6   confirmation.  This also was addressed the hearing transcript

7   on August 27th, Page 4, Lines 15 through 25, but that's

8   gamesmanship.  Property of the estate should have been returned

9   immediately as property of the estate and -- with no

10  preconditions whatsoever, and that's consistent with the

11  Bankruptcy Code.  See 11 U.S.C. Section 541(a):  "Property of

12  the estate consists of all property, wherever located."  And

13  also Section 543, that a custodian of debtor property shall

14  turn over all such property to the estate.

15          So once it is shown that a debtor has exhibited bad

16  faith in its filing, the Court must look to see whether there's

17  any chance of rehabilitation.  Has the story changed?  Has

18  something happened since the first filing in this particular

19  case?  And so for example, quote, "to justify a second Chapter

20  11 filing following dismissal of a prior case, the debtor must

21  show an unanticipated change in circumstances."  See In re

22  Spectee Group, Inc., 185 B.R. 146, 156 (Bankr. S.D.N.Y. 1995),

23  which is citing the In re Elmwood Development Company case, 964

24  F.2d 508, 511 (5th Cir. 1992).

25          So let's look at the circumstances here.  The

1   debtor's plan for reorganization rests once again on the

2   reinstatement of the loan, a reinstatement that required the

3   debtor's principals to secure some $5 million in funding.  See

4   debtor's proposed Chapter 11 plan of reorganization at ECF

5   Number 42.  This is exactly the same plan that debtor put forth

6   in its first unsuccessful case, but the debtor has provided no

7   evidence as to why that might succeed now when it didn't

8   succeed before.  As the United States Trustee's office very

9   potently observed, quote, "On its face, the plan looks

10  illusory, infeasible, and the plan itself invites a whole host

11  of litigation."  See hearing transcript August 27th, 2025, at

12  Page 8, Lines 1 through 8.  So the debtor's actions in this

13  case to date indicate neither a change in circumstance nor

14  invite any confidence in the feasibility of reorganization.

15          And for the -- all these reasons, the Court cannot

16  find that the debtor has met its burden of showing the

17  existence of unusual circumstances.  Such a dismissal is not in

18  the best interest of creditors.  So there are other aspects of

19  this case that cite various other parts of the standard:  there

20  being only one asset.  We've already talked about few unsecured

21  creditors, the loan asset being the subject of a foreclosure

22  action, that this is essentially being a two-party dispute,

23  that the timing of the filing is intended to hinder or delay.

24  There's no -- while the debtor here does have the cash flow,

25  the debtor has not accounted for that cash flow in its DIP

1   account, and it's unclear whether it's entitled to that cash

2   flow and -- given the assignment of rents that exists to Fannie

3   Mae, which I note has never been challenged in this case or the

4   last case.

5   So in turning to the other aspects of bad faith that

6   are mentioned, again, the conduct here in this case and the

7   prior case and the state court case evidence an attempt to

8   thwart a legitimate protection of its rights by the creditor

9   without really having any plan that is viable for bankruptcy

10  while at the same time not honoring the debtor's obligations

11  under the Bankruptcy Code to safeguard assets, but rather

12  there's lots of reasons to be concerned that this case is being

13  run for the benefit of the debtor's equity owners.  So that's

14  the Court's decision.  The transcript will serve as the record

15  of that.  I'd ask that Fannie Mae submit a proposed order

16  granting the dismissal motion.  It can be fairly bare-bones and

17  say for the reasons set forth on the record and the hearing on

18  September 18th, the Court hereby dismisses the case.

19  So the only other thing to address is the issue of a

20  filing bar.  And turning to that question, the Court notes in

21  the Second Circuit bankruptcy courts have the authority to bar

22  a debtor from refiling.  See In re Casse -- C-A-S-S-E -- 198

23  F.3d 327, 340 (2d. Cir. 1999).  The Second Circuit has held

24  that a bankruptcy court -- that the Bankruptcy Code authorizes

25  bankruptcy courts to dismiss bankruptcies with prejudice --

1   that is, with a bar to future filings beyond the 180-day period

2   contemplated by Section 109(g) where there is cause.  And

3   again, that's the In re Casse case.  A bankruptcy court has

4   cause to dismiss with a bar to future filings where the -- a

5   court finds the case was filed in bad faith.  Again, In re

6   Casse.  And so as explained above, the Court has found this

7   case to be one filed in bad faith and accordingly shall dismiss

8   it with a 12-month bar to refiling from the entry of this

9   order.

10          And one last thing I note in connection with all of

11  this is the plan both in this case and the prior case has been

12  the reinstatement of the loan.  Nothing prevents a debtor in

13  bankruptcy or outside of bankruptcy from reinstating a loan.

14  If you get financing and are able to pay a creditor, I have

15  found that creditors uniformly are always happen -- happy to

16  listen to parties who come forward with money, and a

17  reinstatement of the loan would mean that Fannie Mae has not

18  given up any of its rights but rather the loan had been

19  reinstated under its terms, and it's been cured.  And there's

20  frankly no reason why Fannie Mae wouldn't be willing to talk

21  about that.  So that's not prevented by the dismissal of this

22  case.  But again, there's been no evidence that such a plan

23  here is viable, feasible, or there's any evidence that it could

24  work.

25          So with that, the order should mention a bar to

 1 | refiling, and with that, I believe any other matter listed for

 2 | today in the case is moot in light of the dismissal.  And so

 3 | with that, I'll turn it over to the parties to see if there's

 4 | anything else that anybody needs addressed here today.

 5 |         MR. HEMENWAY:  Thank you, Your Honor.  Zach Hemenway

 6 | for Fannie Mae.  I just wanted to make sure I understood.  The

 7 | draft order should mention the 12-month bar, and we should

 8 | submit that to chambers.

 9 |         THE COURT:  Yes.

10 |         MR. HEMENWAY:  Thank you, Your Honor.

11 |         THE COURT:  All right.  Anything from debtor's

12 | counsel?

13 |         MR. HORN:  No, Your Honor.

14 |         THE COURT:  All right.  Anything from the United

15 | States Trustee's Office?

16 |         MR. VELEZ-RIVERA:  No, Your Honor.  Thank you.

17 |         THE COURT:  All right.  Thank you very much.  I

18 | appreciate all the briefing back and forth and the fact that

19 | this was done on timeframe fairly promptly over the summer.

20 | And I also appreciate your patience in waiting for me to get

21 | you this decision.  And finally, I appreciate your flexibility.

22 | I changed sort of my traditional path of doing this in waiting

23 | because I didn't want you all to spend time and money taking

24 | other steps with the understanding that I was going to issue a

25 | ruling dismissing the case.  I didn't think that was

```
 1  appropriate or fair.  And so hopefully -- while I know the

 2  debtor's not happy with this result, I hopefully have avoided

 3  having debtor and debtor's counsel do things that would

 4  ultimately not be fruitful uses of your time.  So all right.

 5  Thank you very much, and with that, the Court will move on to

 6  the next matter on the agenda.

 7            MR. HORN:  Thank you, Your Honor.

 8            MR. HEMENWAY:  Thank you, Judge.

 9       (Proceedings concluded at 11:34 a.m.)

10                      *  *  *  *  *

11

12

13

14            C E R T I F I C A T I O N

15

16       I, Alicia Jarrett, court-approved transcriber, hereby

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21

22

23  _____

24  ALICIA JARRETT, AAERT NO. 428   DATE: September 22, 2025

25  ACCESS TRANSCRIPTS, LLC
```